**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**GREENEVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **No.: 2:18-CR-00112** |
| | ) | **REEVES/CORKER** |
| **MARIA LUISA MARISCAL** | ) | |
| | ) | |
| *Defendant.* | ) | |

**MEMORANDUM and ORDER**

Defendant, Maria Mariscal, objects to Magistrate Judge Corker's Report and Recommen-

dation [D. 41], which recommends that Ms. Mariscal's motions to suppress [D. 30, 36] be denied.

For the following reasons, Ms. Mariscal's objection [D. 48] is overruled, the Report and Recom-

mendation is accepted in whole, and the motions to suppress are denied.

## I.    PROCEDURAL BACKGROUND

Ms. Mariscal was indicted on August 15, 2018, for one count of conspiring to distribute,

and possess with the intent to distribute, 50 grams or more of methamphetamine, its salts, isomers,

and salts of its isomers, in violation of 21 U.S.C. § 846, 841(a)(1), and 841(b)(1)(A) [D. 20]. She

has filed two motions to suppress evidence recovered in one traffic stop. The initial motion to

suppress was filed on November 21, 2018, arguing the traffic stop was prolonged beyond the

amount of time reasonably required to complete the stop's mission [D. 30]. Later, Ms. Mariscal

filed a supplement, arguing the officer also searched her vehicle without her consent [D. 36].

Judge Corker held a hearing regarding the motion and supplement on March 1, 2019 [D.

39], and promptly filed the Report and Recommendation [D. 41]. Ms. Mariscal has objected, and

the Government has responded [D. 48, 49], so the issue is now ripe for decision. The standard of

review is de novo. 28 U.S.C. § 636(b)(1)(B); FED. R. CRIM. P. 59(b)(2).

## II. FACTUAL BACKGROUND[1]

Ms. Mariscal seeks to suppress evidence of twenty-two vacuum sealed bags, containing an approximate total of twenty-seven pounds of methamphetamine, recovered by Texas State Trooper Max Honesto from her car on April 4, 2018 [D. 37-3]. On that day, Trooper Honesto was patrolling Interstate 40 in the Texas panhandle, a stretch of highway known for drug trafficking. He saw an eastbound vehicle move from the right to the left lane without using a signal, in violation of TEX. TRANSP. CODE § 545.106. He initiated a check on the license plate, and pulled the car over.

Once they were on the side of the road, Trooper Honesto noticed the car had a non-functioning brake light. He also noticed that both the driver and passenger side window were open, which struck him as "kind of odd"[2] [D. 42, p. 9]. He had learned from past experience that motorists trafficking drugs would often open both windows in an attempt to air out the car.

Trooper Honesto approached the vehicle from the passenger side, identified himself, asked for license and registration, and explained the reason for the stop. Ms. Mariscal was in the passenger seat, but said she owned the car, which a young man was driving. Trooper Honesto asked the young man to step out of the car and wait by the patrol car ("common practice" in traffic stops [*Id.*, p. 10]), while he spoke with Ms. Mariscal.

Trooper Honesto wanted to talk with her because—despite her claim that she owned the car—Ms. Mariscal was not listed on the insurance paperwork, either as the main insured or as a driver. She explained this discrepancy by telling Trooper Honesto that the main insured was her boyfriend, who had just sold the car to her, and that the young man driving the car was her son.

---

[1] Camera footage from Trooper Honesto's car (with one camera facing out from the dashboard, and the other facing inward) was placed into evidence at the hearing, and parts of the footage where Trooper Honesto and Ms. Mariscal spoke to each other in Spanish are transcribed [D. 40] Trooper Honesto's testimony at the March 1 hearing is also transcribed [D. 41].

[2] The surrounding landscape is very flat, and the wind is audible when listening the exterior dash camera footage. As the stop progresses, the vehicle occupants do appear visibly chilled when standing outside of the car.

When Trooper Honesto checked the date of registration, he noticed that it had only recently been registered—in his experience, it is "common practice" for drug traffickers to register a vehicle immediately prior to making a drug run [D. 42, p. 13].

The two discussed Ms. Mariscal's travel plans: She was headed from California to Tennessee for the first time to visit her aunt Yolanda (related through her dad's side), who had cancer. She and her son only planned to stay with Yolanda's family for two days.

Trooper Honesto then asked the young man to sit in his patrol car while he wrote out the ticket. While this was happening, Trooper Honesto asked the young man some of the same questions he'd asked Ms. Mariscal. The young man confirmed they were traveling to visit Ms. Mariscal's aunt, who was "super sick." But other details did not match Ms. Mariscal's story. For example, the young man said they planned to stay in a hotel, not with the family, and was under the impression they were staying in Tennessee for more than two days. The young man also thought the aunt's name was "Maria."

Trooper Honesto asked the young man about what he did back in California. Hesitating, the young man said his work was "like landscaping...like drywall...it's like different things" [D. 37-1, at 07:00]. The details of the young man's occupation became less clear as Trooper Honesto asked more questions. At first, he said he worked for his uncle, then said he'd quit within the past two weeks. He attempted to clarify this discrepancy by saying his uncle still let him work from time to time, and that he had to be back to work on "maybe" Monday.

Trooper Honesto next asked about the family. The young man said Ms. Mariscal was his Mom, that she was not working at the moment, and that she was separated from his father, who was a painter. When asked about the name on the vehicle registration, the young man said it was Ms. Mariscal's boyfriend. When asked why the boyfriend did not come on the trip, he said that he

wasn't sure, but maybe that the two were "having problems." (The young man said he lived with his father.) As far as the aunt they were going to see, the young man said he was pretty sure she was at a hospital, but was not sure whether the aunt was related to Ms. Mariscal through her mom or dad's side. Trooper Honesto then asked the young man if he knew a "lady named Yolanda." The young man paused and audibly hesitated. He suggested it was maybe one of Ms. Mariscal's sisters. But he wasn't sure, because "all the family's over there [in Tennessee],"[3] and it was only his first time visiting [*Id.*, 11:25].

Trooper Honesto printed out the traffic warning and handed the young man his ID card, as well as Ms. Mariscal's. Before the conversation ended, Trooper Honesto saw Ms. Mariscal open the passenger door and look back. She appeared to be "in suspense" and "anxious" about what was going on in the patrol car [D. 42, p. 19]. By this point, Trooper Honesto believed there was "more than just a traffic violation" [D. 42, pp. 17-18]. He finished by asking the young man when he'd last seen the aunt and how they were related. The young man was not sure, but that it was a long time ago. Trooper Honesto said, "so, it's your mom's sister, then?" The young man quickly said, "No, no...she doesn't have a sister. She has two brothers." [D. 37-1, at 12:55]. (Yet only ninety seconds prior, the young man said his Mom had "sisters" in Tennessee.) Trooper Honesto wrote out the ticket, excused the young man, and asked Ms. Mariscal to come back to the patrol car.

Ms. Mariscal returned to the car.[4] Trooper Honesto began by saying he just wanted to "clarify" the details of the trip—in her response, Ms. Mariscal spoke at length about the family they were visiting and said, unprompted, that she was an only child [*Id.*, 14:05]. She also contra-dicted the young man in other ways. For instance, the young man said the aunt was at a hospital;

---

[3] Yet, Ms. Mariscal had told Trooper Honesto it was her first time visiting Tennessee.

[4] It is clear from the video that both Ms. Mariscal and Trooper Honesto are fluent in Spanish. In the conversation that follows, the two switch between Spanish and English frequently. The section of the summary is taken from the vide-otape [D. 37-1], and refers to the translation when necessary [D. 37-2].

Ms. Mariscal said the aunt was staying at her house. The young man said he had just quit his job with his uncle; Ms. Mariscal said he was going to start a new job, working for her friend.

After a back and forth about where Ms. Mariscal and the young man would be staying, both on the road and when they arrived in Tennessee, Trooper Honesto told Ms. Mariscal that her story sounded "strange" and "out of the ordinary" [*Id.*, 20:00]. He explained, "the reason I'm asking the questions is because his story and your story aren't the same" [D. 37-2].

Trooper Honesto then asked Ms. Mariscal, "you don't have anything illegal inside this car, do you?" To which she replied: "No, señor, puede checarlo." (No, sir, you can check it.) [D. 37-2, p. 20]. Shortly after this, he asked Ms. Mariscal where she got the car. She replied: "I can open it, if you want to check it out" [*Id.*, p. 22]. Trooper Honesto followed up:

> Honesto: So...,so, this is...this is my question to you, all right?
> Mariscal: Go ahead.
> Honesto: Since you're the owner of the car, you know what I mean? I could've asked him, but I'm asking you since you're the owner of the car, can I search your car, everything, from the front to the back, from the bottom to the top?
> Mariscal: **You can.** But what I'm saying is am I being pulled over for a [unintelligible]? **But yeah you can go ahead.**
> Honesto: OK.

[*Id.* (emphasis added)].

Trooper Honesto then explained the search is not related to the traffic violation, but due to the fact that Ms. Mariscal and the young man were telling him different stories. He continued:

> Honesto: So, my...my...question still stands, if you'll give me permission to search the whole car.
> Mariscal: **Go ahead.**
> Honesto: So, that's a yes?
> Mariscal: **Yeah, um, if you want.**
> Honesto: Well, that's what I want to do. I need...need...
> Mariscal: *If I tell you no, either way you're going to hold me up*...[Honesto clears throat]...and you're going to keep me waiting, and I...I just want to get some rest, seriously. And like I said, I have...
> Honesto: So, Maria, what I need is, uh, yes or no.
> Mariscal: **That's what I said, you can go ahead.**
> Honesto: OK. All right.

[*Id.*, pp. 23-24 (emphasis added)].

5

With this blessing, Trooper Honesto searched the car, and found contraband inside the panels of all four doors. At this point, he arrested both Ms. Mariscal and the young man.

Ms. Mariscal argues the stop was unconstitutional because Trooper Honesto did not develop the reasonable suspicion necessary to extend the stop after he gave the young man the warning ticket, and that even if there was reasonable suspicion to extend the stop, Ms. Mariscal did not consent to have her car searched. The two arguments will be addressed in turn.

## III.    REASONABLE SUSPICION

### a.  Applicable Law

A seizure for a traffic violation will justify a police investigation of that violation. *Rodriguez v. U.S.*, 135 S.Ct. 1609, 1614 (2015). But for purposes of constitutional analysis, the investigation of a "routine" traffic stop is analyzed like a so-called *Terry* stop, rather than a formal arrest. *Knowles v. Iowa*, 525 U.S. 113, 117 (1998); *Cf. Terry v. Ohio*, 392 U.S. 1, 20-22 (1968). Thus, the "tolerable duration of police inquiries in the traffic stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop." *Rodriguez*, 135 S.Ct. at 1614.

An officer's mission includes "ordinary inquiries incident to the traffic stop," such as checking the driver's license, seeing if there are outstanding warrants, as well as inspecting the vehicle registration and proof of insurance. *Rodriguez*, 135 S. Ct. at 1615 (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)). In addition, the officer may inquire into matters unrelated to the justification for the traffic stop, so long as the inquiries do not measurably extend the stop's duration. *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). The officer may also take certain steps to reduce the risk of harm to police and the vehicle's occupants by ordering the driver and any passengers out of the vehicle. *Id.* at 330-32 (citation omitted). But once the stop's purpose has been achieved, "an officer cannot further detain the vehicle or its occupants unless something

happened during the stop to cause the officer to have a reasonable and articulable suspicion that criminal activity is afoot." *U.S. v. Davis*, 430 F.3d 345, 353 (6th Cir. 2005).

If the stop extends past this point, the two-step analysis for *Terry* stops is used to determine if the temporary detention was constitutional. *Id.* First, the court asks whether there was a proper basis for the stop, by examining whether the officer was aware of "specific and articulable" facts which give rise to "reasonable suspicion" of criminal activity. *Id.* If there was a proper basis, the degree of intrusion must be reasonably related in scope to the situation at hand. *Id.* The overall analysis should take into account the "totality of the circumstances." *U.S. v. Williams*, 804 F. Supp. 2d 659, 662 (M.D. Tenn. 2011) (citing *U.S. v. Hensley*, 469 U.S. 221, 227 (1985)).

### b. Application

Ms. Mariscal concedes there was a traffic violation, and therefore that Trooper Honesto had probable cause for the initial stop. She argues, however, that once the warning ticket was issued, there was no reasonable suspicion to continue the stop [D. 48, p. 3].[5] In making this claim, she relies heavily on a comparison to the facts of *Florida v. Royer*, 460 U.S. 491 (1983).

In *Royer*, detectives observed the defendant at Miami International Airport. Based on the defendant's "appearance, mannerisms, luggage, and actions" the detectives concluded he fit the "drug courier profile." *Id.* at 493. As the defendant made his way to the boarding area, the detectives approached and asked the defendant if he had a "moment" to speak, which he did. *Id.* at 494.

---

[5] Ms. Mariscal also insinuates she was the victim of racial profiling, and argues these concerns should be considered in the "context" of the seizure [*see* D. 48, p. 4 ("The government downplays the issue relating to Ms. Mariscal being Hispanic and the added factors relating to a Hispanic individual's interactions with law enforcement")]. The Court takes any allegations of racial profiling seriously, but does not find much evidence to suggest that Ms. Mariscal was profiled in a manner that rises to the level of a constitutional violation. The objection mentions that Trooper Honesto "initiated" a conversation in Spanish, but that is not clear evidence of profiling; in fact, it could be understood just as easily to suggest Trooper Honesto was trying to build trust with Ms. Mariscal and was treating her fairly. (Moreover, Ms. Mariscal herself would sometimes respond to an English statement from Trooper Honesto by speaking in Spanish.) Without more facts—and no case law—to bolster this racial profiling claim, the Court does not have what it needs to conclude the racial "context" of the seizure would contribute to a Fourth Amendment violation.

The defendant produced his identification, and the detectives noticed the last name on the identi-

fication did not match the last name on the luggage; when asked about the discrepancy, the de-

fendant became noticeably more nervous. *Id.*

At this point, the detectives asked the defendant to accompany them to a room, and the

defendant acquiesced. *Id.* The detectives retrieved the luggage and brought it to the room, and the

defendant was asked if he would consent to a search. *Id.* He did not reply orally, but produced a

key and unlocked one of the suitcases. *Id.* The detectives opened the suitcase, and found drugs

inside (and shortly afterward, found drugs in another suitcase). *Id.*

The Court did not use *Royer* to propose a "litmus-paper" test for determining when a sei-

zure was illegal. *Id.* at 506-07. Rather, it issued a more restrained opinion, finding that the bounds

of an investigative stop had been exceeded on the facts of the case. *Id.* For instance, even though

the officers had brought the defendant to an interrogation room, it "appear[ed]...that the primary

interest of the officers was not in having an extended conversation with [the defendant] but in the

contents of the luggage, a matter which the officers did not pursue orally with [the defendant] until

after the encounter was relocated to the police room." *Id.* at 504.

Ms. Mariscal says that, in *Royer*, the defendant's "appearance, mannerisms, luggage, ac-

tions, and *discrepancies in his story* gave the officer's suspicion that he was involved in drug

activity" [D. 48, p. 4 (emphasis added)]. The Court did say the detectives believed that Royer's

"appearance, mannerisms, luggage, and actions" fit a "drug courier profile." *Royer*, 460 U.S. at

493. But the Court never said the officers accounted for "discrepancies" in the defendant's story.

The issue in *Royer* was that the detectives never tried to get the defendant's story—they simply

found that he fit a "profile" based on his appearance and detained him. *Id.* at 504. If the detectives

8

there had in fact coaxed a story out of the defendant and found it suspicious prior to detaining him in the police room, the *Royer* opinion suggests further detention may have been warranted.

Here, Trooper Honesto spoke with Ms. Mariscal and the young man for twenty minutes about their travel plans prior to seeking any consent. Initially, this questioning was authorized because it was conducted in the course of a legal traffic stop. By the time he wrote out the ticket and handed it to the young man driving the car (who appears visibly hesitant and nervous on camera), there were a few glaring discrepancies in the stories. Most notably, they gave different names for the aunt they were supposedly going to visit, and when Trooper Honesto asked the young man if he knew a "Yolanda" (the name given by Ms. Mariscal), the young man could not identify any relative with that name. The two of them had also provided drastically different details on their stay in Tennessee: Depending on who was asked, they were either staying there indefinitely, or for only two days, and they were either staying at a hotel, or at the aunt's house.

A layperson would become suspicious after hearing these stories. Trooper Honesto, an experienced drug interdiction officer, laid the suspicious stories on top of a foundation he had already built from his professional observations: the open windows; the fact that neither occupant was on the insurance paperwork for the vehicle; the recently issued registration; and his observation that Ms. Mariscal had looked back at him, visibly "anxious," while he questioned the young man.

Thus, the appearance, mannerisms, and actions of the vehicle occupants, *along with* the discrepancies in the stories, gave Trooper Honesto reasonable suspicion to extend the stop and question Ms. Mariscal further.

As the questioning continued, the stories only further unraveled. For instance, the young man had suggested at one point that Ms. Mariscal might have a sister named Yolanda, but then later said she had only brothers. Ms. Mariscal, for her part, said she was an only child. According

to the young man, he had just quit work; according to Ms. Mariscal, he needed to be back in California soon so he could start a new job.

And when they could give details, they were remarkably non-specific. Most notably, they were traveling to Tennessee—where, according to the young man, "all the family" was located—yet they could not provide *any* more specificity regarding where in the state they were headed.

Alternatively, Ms. Mariscal argues that even if there was a proper basis for the stop, the degree of intrusion was not reasonably related in scope to the situation at hand. Specifically, under *Royer*, she argues Trooper Honesto should have called for a drug-sniffing dog, which would have been less intrusive than questioning the suspects and eventually obtaining consent for a search [D. 48, p. 3]. At the hearing on this motion, Trooper Honesto admitted he did not try to obtain a drug dog in this instance, although he had used them before [D. 42, pp. 34-35].

In *Royer*, the Court did say that there was "no indication" that trained drug dogs were not available, and that if they had been used, the defendant could have been momentarily detained while that investigative procedure was carried out. 460 U.S. at 505-06. But yet again, Ms. Mariscal construes the discussion of *Royer* as being categorical in spite of the Court's admonition that its opinion was not a "litmus-paper test." *Id.* at 506.

An investigative detention is evaluated on the totality of the circumstances, and the law requires an officer to use the least intrusive means *reasonably available* to verify or dispel her suspicion. *Id.* at 500. The detention in *Royer* took place in the Miami airport; the detention here was on the side of a highway in the rural Texas panhandle. A drug-sniffing dog is more likely to be reasonably available in the former circumstance than the latter. Nor was the investigative route chosen by Trooper Honesto especially intrusive—all he did was ask questions, never making phys-ical contact with either Ms. Mariscal or the young man. *Royer* did not require Trooper Honesto to

call a drug-sniffing dog, and the Court does not find that his prolonged questioning of Ms. Mariscal and the young man was overly intrusive in this situation.

In sum, the Court finds Ms. Mariscal was lawfully detained up until Trooper Honesto obtained her consent to search the vehicle. It must now be determined whether this consent was lawfully obtained, and therefore whether the warrantless search of the vehicle was constitutional.

## IV.    CONSENT

### a.  Applicable Law

The text of the Fourth Amendment requires state actors to obtain a warrant prior to searching a vehicle. U.S. CONST. amend. IV. Yet the Supreme Court has carved out a few "jealously and carefully drawn" exceptions to the warrant requirement. *U.S. v. Watson*, 423 U.S. 411, 427 (1976). One of the "most common" is the exception for a search conducted with voluntary and valid consent. *U.S. v. Worley*, 193 F.3d 380, 385-86 (6th Cir. 1999).

The Government carries the burden of showing valid consent was obtained, through "clear and positive" testimony. *U.S. v. Riascos-Suarez*, 73 F.3d 616, 625 (6th Cir. 1996). Courts then evaluate whether the consent was valid (that is, whether it was "free and voluntary") by examining the totality of the circumstances. *Id.* Factors considered include: "the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; whether the individual understands her constitutional rights; the length and nature of the detention; and the use of coercive or punishing conduct by the police." *Id.*

### b.  Application

In her objection, Ms. Mariscal argues that she did not voluntarily and validly consent by again relying almost exclusively on one case, *U.S. v. Worley*, 193 F.3d 380 (6th Cir. 1999). Ms. Mariscal relies heavily on a fact-specific comparison to *Worley*, even though the opinion itself

11

cautions that "there is no 'magic' formula or equation that a court must apply in all cases to determine whether consent was valid or voluntarily given" *Id.* at 387; *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973) ("[Prior] cases yield no talismanic definition of 'voluntariness,' mechanically applicable to the host of situations where the question has arisen.").

Even in *Worley*, the Sixth Circuit found many of the typically considered factors were satisfied, but ultimately upheld the district court's ruling in favor of the defendant who, when asked for his consent, told the officer, "You've got the badge, I guess you can." *Id.* Here, Ms. Mariscal does say at one point, "[i]f I tell you no, either way you're going to hold me up" [D. 37-2, p. 23].

The difference between *Worley* and this case is that Ms. Mariscal gave clear verbal consent many other times. She did so twice before Trooper Honesto even asked, saying he can "check [the car]" (in response to a question about whether there was anything illegal in the car) or "check [the car] out" (in response to a question about where she got the car) [D. 37-2, pp. 20-22]. She then then tells Trooper Honesto that he can search her car three more times in response to his direct questions [*Id.*, pp. 22-24].

When she does say, "either way, you're going to hold me up," Trooper Honesto responded by saying "what [he] need[s]" is "yes *or no*" [*Id.*, p. 24 (emphasis added)]. She replied, "[t]hat's what I said, you can go ahead" [*Id.*]. This final question-and-answer is important for two reasons. First, by saying she can respond with a "yes," or with a "no," Trooper Honesto makes it clear that Ms. Mariscal can refuse consent. What he needs is *an* answer, but he is not nudging her to give the answer that he wants. Second, Ms. Mariscal says "[t]hat's what I said," which clears up her prior equivocation, and confirms that she was aware she had already provided consent to the search (suggesting her consent was "intelligently given").

12

It is also important to clarify that she says, "either way, *you're going to hold me up*," not, "either way, *you're going to search the car*." Even if she was not happy about it, Ms. Mariscal was correct: so long as he had reasonable suspicion, Trooper Honesto *could* continue to detain her. The issue is whether she thought he would search her car even without her consent.[6]

Ms. Mariscal at first gave unequivocal consent to have her car searched, without a direct question from Trooper Honesto. To be sure, he asked for her consent three more times, and she said a search was OK each time. The one time she did hesitate, Trooper Honesto did not press forward, but clarified that she could say "yes or no." Ms. Mariscal replied to this by saying her consent had already been given ("[t]hat's what I said").

The totality of the circumstances show that unequivocal, specific, and intelligent consent was given, and there is no evidence that Trooper Honesto coerced Ms. Mariscal into giving consent, or that she acted under duress. Accordingly, the Court finds that the resulting warrantless search of her car was lawful and did not violate the Fourth Amendment.

## V. CONCLUSION

Because Trooper Honesto had reasonable suspicion to detain Ms. Mariscal throughout the stop, and because he had her consent to search the car, Ms. Mariscal's objection [D. 48] is **OVER-RULED**. The Court **ACCEPTS IN WHOLE** the Report and Recommendation of Judge Corker [D. 41] and Ms. Mariscal's motions to suppress [D. 30, 36] are hereby **DENIED**.

**IT IS SO ORDERED.**

CHIEF UNITED STATES DISTRICT JUDGE

---

[6] Compare this with another case where a court applied *Worley* in the defendant's favor, *U.S. v. Culp*, 860 F. Supp. 2d 459, 467 (W.D. Mich. 2012). ("Trooper: 'Can I search your car?' Defendant: "It's up to you, sir.").